# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DAVID SHELTON,

      Plaintiff

v.

MICHAEL MINEV, et. al.,

      Defendants

Case No.: 3:19-cv-00420-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 57

This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 57, 57-1 to 57-11, 59-1 to 59-6.) Plaintiff filed a response. (ECF No. 62.) Defendants filed a reply. (ECF No. 63.)

After a thorough review, it is recommended that Defendants' motion be granted.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 4.) The events giving rise to this action took place while Plaintiff was housed at Lovelock Correctional Center (LCC). (*Id.*) Defendants are Russelle Donnelly, Brian Egerton, Dr. Michael Minev, Dr. Catherine Yup, and Desiree Hultenschmidt.

The court screened Plaintiff's complaint and allowed him to proceed with an Eighth Amendment deliberate indifference to dental care claim against Donnelly, Egerton, Dr. Minev, Dr. Yup and Hultenschmidt, as well as a claim for retaliation against Dr. Yup.

Plaintiff alleges that in June of 2018, he submitted several requests to see the dentist due to suffering severe pain from toothaches. He filed an informal level grievance regarding his pain on June 25, 2018. He complained he had to wait more than seven weeks to receive treatment from Dr. Yup, and as a result of the pain he had difficulty eating. In addition, he said that the dental department was aware he had diabetes, and therefore, that he had "infection issues." He asked to be provided with pain medications while waiting to be seen by the dentist and for an appointment as soon as possible. On July 3, 2018, Egerton responded that Plaintiff had been seen by the dentist.

Plaintiff alleges that his wife sent a letter to Warden Baker at NDOC, complaining about the dentist's treatment of Plaintiff. Warden Baker responded by forwarding the letter to medical. On July 27, 2018, Plaintiff claims Warden Baker called the medical department to discuss with Nurse Donnelly Plaintiff's problems receiving proper care from the dental department.

Next, Plaintiff avers that on August 28, 2018, he submitted a first level grievance challenging Dr. Yup's failure to give him any pain medication after having his tooth pulled and the failure to provide antibiotics after the hole in his mouth became infected. He also complained that Dr. Yup threatened to file a notice of charges against him if any more phone calls were made. Donnelly responded to the grievance by stating Plaintiff had seen the dentist on July 26, 2018 and September 25, 2018.

Plaintiff contends that he filed a second level grievance based on the failure to address the grieved issue of denial of adequate dental care that resulted in pain and infection and parts of his tooth left in the extracted cavity. Plaintiff complained that Dr. Yup punctured a hole in his sinus cavity and caused further pain. He also discussed the ongoing denial of pain medication and antibiotics and deliberate delay of weeks and months in calling him back for necessary

dental care. Dr. Minev responded to the grievance, stating that Plaintiff had been provided with 20 dental appointments and the most complete care available in NDOC. Plaintiff alleges the care he received from Dr. Yup was delayed and improper, including the wrong tooth being pulled, and resulting infection and pain.

Plaintiff claims that Dr. Yup and dental assistant Hultenschmidt were deliberately indifferent to his serious dental needs due to their denial of pain medication after extracting teeth, and the deliberate refusal to supply pain medication and antibiotics when Plaintiff was suffering from a dry socket and infection. Plaintiff avers that Dr. Minev, Donnelly, and Egerton were deliberately indifferent when Plaintiff filed grievances placing them on notice he was deprived of reasonable dental care causing him to suffer in pain and from infection.

Plaintiff further alleges that on November 8, 2018, Plaintiff was called to the dentist for a follow up appointment from having two teeth pulled. Dr. Yup asked Plaintiff twice why he had filed grievances against her. Plaintiff did not respond. Dr. Yup then told Plaintiff there was no power to operate the chair so she would have to reschedule him, but he was not rescheduled until almost two months later. Plaintiff took this to mean that if he did not stop grieving, then Dr. Yup would not treat his dental problems or delay his treatment.

Defendants move for summary judgment, arguing: Plaintiff cannot prevail on his Eighth Amendment or retaliation claims; Hultenschmidt did not have authority to provide the requested medications; Donnelly, Egerton, and Dr. Minev did not personally participate in the alleged constitutional violation by responding to Plaintiff's grievances; and Plaintiff did not exhaust his administrative remedies with respect to the retaliation claim.

1

## II. LEGAL STANDARD

2       The legal standard governing this motion is well settled: a party is entitled to summary

3  judgment when "the movant shows that there is no genuine issue as to any material fact and the

4  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

5  *v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the

6  evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*

7  *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

8  of the case. *Id.* at 248 (disputes over facts that might affect the outcome will preclude summary

9  judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the

10 other hand, where reasonable minds could differ on the material facts at issue, summary

11 judgment is not appropriate. *Anderson*, 477 U.S. at 250.

12       "The purpose of summary judgment is to avoid unnecessary trials when there is no

13 dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

14 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose

15 of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477

16 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that

17 one party must prevail as a matter of law"). In considering a motion for summary judgment, all

18 reasonable inferences are drawn in the light most favorable to the non-moving party. *In re*

19 *Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach*

20 *& Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the

21 nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,*

22 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

23

determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

pleadings and set forth specific facts by producing competent evidence that shows a genuine

dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Eighth Amendment**

    **1. Standard**

"The government has an 'obligation to provide medical care for those whom it is

punishing by incarceration,' and failure to meet that obligation can constitute an Eighth

Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th

Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical

care if he can prove that prison officials were deliberately indifferent to a serious medical need.

*Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two

elements: "the seriousness of the prisoner's medical need and the nature of the defendant's

response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other*

*grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698

F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

"A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further

significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at

1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213.

If the medical need is "serious," the plaintiff must show that the defendant acted with

deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation

omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,

1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or

even gross negligence. *Id.* Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

**2. Dental Evidence**

A physical examination record from March 2008 states that Plaintiff had a few cracked teeth. (ECF No. 59-1 at 2.)

Plaintiff saw Dr. Yup on September 27, 2017, regarding teeth 3, 4, 5 and 32. X-rays were taken. There is a notation of decay regarding tooth 4. There is also a notation of decay into a pulp with respect to tooth 32. It appears there was an extraction of tooth 32. Plaintiff was instructed to kite for a filling of another tooth. (ECF No. 59-2 at 2.)

A kite was received on January 16, 2018, and Plaintiff saw Dr. Yup on January 18, 2018, and it appears that teeth 1 and 3 were extracted. (*Id.*)

On June 25, 2018, Plaintiff filed an informal level grievance, number 20063068061, stating that the LCC dentist deprived him of dental care and there were excessive delays causing him pain for more than seven weeks to treat his top front teeth. He claimed that dental was aware

of his pain and difficulty eating and that he had diabetes and infection issues. He asked for a dental appointment, for a full-time dentist, and for pain management medication while waiting to see the dentist. (ECF No. 57-2 at 11-12.)

He was seen shortly thereafter, on July 2, 2018. An x-ray was taken, and there was no lesion and no facial swelling, and Dr. Yup said his condition did not warrant his having filed grievances on June 25th and 29th. Dr. Yup noted that Plaintiff also had his wife call the medical director's office. Plaintiff was informed that similar tactics in the future would be treated with reports. He was warned about filing unwarranted multiple kites and grievances to be seen ahead of others without justification. Tooth 8 was extracted. Plaintiff was instructed to kite for additional extractions such as tooth 4. It was noted that tooth 11 would need a filling. (*Id.*)

Plaintiff saw Dr. Yup on July 16, 2018. He had slight inflammation on the lingual side. The extraction site was healing. Plaintiff admitting to having ibuprofen placed in vicinity of the extraction sites and placing his tongue in the area of the extraction site, contrary to post-operative instructions. Dr. Yup noted the discomfort was self-induced/self-inflicted. There is a notation about treating a site as if it were a dry socket and it was irrigated and packed with gauze. It was then described as a "pseudo dry socket." Plaintiff was advised to not pull at the gauze. Plaintiff was seeking ibuprofen. He was advised that none was warranted and that ibuprofen would slow down the healing process and would dry out the mouth. (*Id.*)

He saw Dr. Yup on August 7, 2018. No root or tooth fragments were found. The extraction site was treated with gauze. Her notes state that Plaintiff was advised to ask if his wife could send sugarless mints or lemon drops to stimulate salivary flow as Plaintiff had an extremely dry mouth which was contributing to rampant decay. (*Id.* at 3.)

1   Plaintiff saw Dr. Yup next on September 19, 2018. She noted that teeth 24 and 25 both

2   had rampant decay and were non-restorable. The teeth were extracted. Plaintiff said he had the

3   best post-op experience with the use of the gauze. Plaintiff was instructed to kite for

4   evaluation/treatment once the gauze came out on its own. Regarding tooth 8, Dr. Yup said that

5   she pulled out a hard, bone-like sliver, that was not tooth or enamel and not a human bone.

6   Plaintiff admitted it could have been a chicken bone sliver. The surrounding area was pink and

7   firm. Dr. Yup indicated Plaintiff had kited that he had an infection from his mouth to the nose,

8   stating he had a lot of green mucus; however, at his appointment he did not have a runny nose,

9   there was no puss and no sign of infection and Plaintiff was free from pain. When asked about

10  what he wrote in the kite, he said he blew his nose and green stuff came out through his mouth,

11  but it had since cleared up. Dr. Yup explained to him that his upper teeth had no infection and

12  whatever was green/yellow coming out had nothing to do with his teeth. Most likely, he had a

13  cold. He reported that the hard candy had helped stimulate salivary flow. (*Id.*)

14  Plaintiff was then seen by Dr. Yup on November 8, 2018, regarding tooth 8. X-rays were

15  taken. Plaintiff had no lesions and there was no sign of infection. Plaintiff again claimed there

16  was green and yellow stuff coming through his nose. He was advised he stated on

17  September 19, 2018, that it had cleared up. Plaintiff was told to come to dental when he blows

18  his nose so she could check it out. He claimed the stuff came out several times a day, but she had

19  not seen it at his appointments. As far as x-rays and visual exams, there had been no signs of

20  infection. There was rampant decay due to his severe dry mouth, which Dr. Yup said was a result

21  of his intake of Elavil, which he claimed to have reduced to 250 mg per day. Dr. Yup advised

22  Plaintiff that this was still way above the 100 mg maximum recommendation. Dr. Yup further

23  noted that Plaintiff had not been consistent in using the sugarless candy to stimulate salivary

flow, citing non-availability. Dr. Yup suggested that his visitors could supply him. Dr. Yup also stated that the equipment was down that day and so she could not perform any restorations and Plaintiff would be rescheduled. Plaintiff was advised to keep the partials in his mouth to prevent over closing until she could perform repairs. She gave him samples of Fixodent and applied it to his partials to ensure they stayed in place, and they did, even with chewing. Plaintiff claimed he had sores on his tongue due to biting on the tongue with a jagged edge of his teeth. One of the sores was on the anterior tip where the lower teeth were missing. Plaintiff was told the sores were not healing quickly due to dry mouth. She asked Plaintiff if he would like to read about the dental consequences regarding use of Elavil, and he declined, stating he was aware. (*Id*. at 3-4.)

Plaintiff saw Dr. Yup on January 7, 2019, and she advised him he did not have a lesion and he had no infection. There are notations about restorative work for teeth 10, 11, 21, 22, 23, 26, 27 and 28. (*Id*. at 5.) Plaintiff saw Dr. Yup again on January 24, 2019. Plaintiff said he had no issues with his last fillings, but felt there was something in the area between teeth 10 and 11. Plaintiff was advised his partials would be adjusted. (*Id*.)

Plaintiff was seen again on February 11, 2019. An x-ray was taken of tooth 11. There is a notation regarding the root and a PA (periapical) lesion and swelling. He was prescribed Amoxicillin ant tooth 11 was extracted. (*Id*.)

On April 11, 2019, Plaintiff saw Dr. Yup for extraction of tooth 10. Impressions were taken for his partials. It was noted that no medications were needed for that procedure. (*Id*.)

Plaintiff saw Dr. Yup on August 26, 2019. He complained he lost fillings on teeth 7 and 9. He had also lost the filling and some tooth structure on tooth 27. There were no bone or tooth fragments present. There was no facial or gingival swelling and no sensitivity to temperatures, percussion or palpation. He was asymptomatic except for food getting caught in the areas of the

lost fillings and the sharp edge of tooth 27 rubbing against his tongue. All treatment was done temporarily until his partials were received from the lab. Dr. Yup noted Plaintiff was taking medications (Elavil) at levels that were causing an extreme dry mouth. Plaintiff brought up the idea of extracting all of his teeth. Dr. Yup explained to him that his bone support was still good and there was no sign of infection or fragments of bone or teeth. With his dry mouth condition and his bruxism, his teeth become more brittle and more prone to decay (even around existing restorations that were recently put in). In the meantime, Plaintiff was advised again to suck on sugarless peppermint candy, to drink more fluids and to rinse with water often, especially after eating, and to brush after eating. She concluded that going with full dentures with his dry mouth condition would be the most difficult situation/scenario as far as stabilization and retention. He was instructed to kite if his condition became symptomatic. He received temporary restorative work for teeth 7 and 9 and she smoothed off the sharp edge of tooth 27. (*Id*. at 7.)

Plaintiff saw Dr. Yup on November 7, 2019. An x-ray and exam of tooth 28 showed a lesion around the existing root, but no swelling. Tooth 28 was extracted, as it was deemed non-restorable.  It was packed with gauze and dry socket paste. Dr. Yup noted that no post-operative medications were needed. (*Id*. at 9.)

Plaintiff received his upper and lower partials on November 19, 2019. Dr. Yup's notes state that because Plaintiff has been wheelchair bound, she would fill and repair his natural teeth in the future in several visits as was agreed to by Plaintiff. (*Id*. at 10.)

Plaintiff had orders for 800 mg ibuprofen throughout this time period. (*See* ECF Nos. 59-4; ECF No. 59-5 at 3, 5, 7, 8.) He was also taking Elavil for pain during this time. (ECF Nos. 59-3, 59-4, 59-5.)

### 3. Discussion

Defendants argue that a difference of opinion regarding the course of treatment does not rise to the level of deliberate indifference, and Plaintiff has not been harmed by the alleged lack of treatment. They contend that he was receiving analgesic pain medication the entire time he claims he was suffering in pain. In addition, they argue there was no evidence of untreated infection and there is no evidence his treatment was denied or delayed.

Plaintiff claims that it was at the July 16, 2018 appointment that he informed Dr. Yup that he believed a hole had been opened into his nasal cavity because he was blowing green mucus. (Pl. Decl., ECF No. 62 at 20 ¶ 6.)  Plaintiff also disputes that at the September 19, 2018 appointment, he said he had no pain and that the infection cleared up on its own. He claims that he had a puss pocket behind the front tooth that was excreting puss, that was witnessed by his wife during a visit. (Pl. Decl., ECF No. 62 at 21 ¶¶ 13-14.)

Plaintiff argues that the intentional denial or delay of dental care is deliberate indifference. He states that he sent kites for 7 weeks and then filed grievances while suffering in pain. Plaintiff asserts that Dr. Yup admits Plaintiff had serious decay, but she would only pull one or two teeth per visit, which are scheduled at two-month intervals or more. Plaintiff maintains that he contracted an infection from a pulled tooth, which his wife witnessed. Plaintiff states that Dr. Yup said there was no infection or dry socket, but then on February 11, 2019, she prescribed an antibiotic and pain medication. Plaintiff argues that a jury could infer that Plaintiff had an infection that Dr. Yup refused to treat for seven months.

Plaintiff claims that he kited for 7 weeks that he was in dental pain before being seen, but he provides no evidence to support this allegation. Instead, the evidence reflects that Plaintiff was seen in September of 2017, and had an extraction done, and was instructed to kite for a

filling of another tooth. Plaintiff sent a kite on January 16, 2018, and saw Dr. Yup two days later, on January 18, 2018, and had two teeth extracted. There is no record in the evidence of any filing of a kite or grievance regarding dental issues until Plaintiff filed his informal level grievance on June 25, 2018. (ECF No. 57-2 at 11-12.) Plaintiff was seen shortly thereafter, on July 2, 2018. After that, Plaintiff was then seen roughly every month or two, and sometimes more than once in a month. The court cannot conclude that this level of care rises to the level of deliberate indifference. There is no evidence of any significant delay. Even if two months between appointments could be considered a delay in treatment, there is no evidence that this caused any harm as there is nothing in the record demonstrating that Plaintiff submitted any kites to the dental department that he was in pain in between appointments.

Insofar as Plaintiff alleges he was not provided with pain medications, there are no records of kites of him requesting pain medication. There is a notation for the July 16, 2018, appointment that Plaintiff requested ibuprofen, but Dr. Yup stated at that point that it was not warranted and would slow down the healing process and dry out his mouth. In any event, as Defendants point out, Plaintiff's medical records reveal that he was consistently prescribed Ibuprofen and Motrin at 800 mg to "keep-on-person," and he was also taking a high dose of Elavil for pain.

Finally, insofar as Plaintiff alleges that Defendants failed to provide him with antibiotics for infections, the records do not support his claims of infection. At his September and November 2018 appointments, he claimed that he had green mucus; however, Dr. Yup examined him and determined there was no sign of infection related to his teeth. Plaintiff speculates that Dr. Yup made a hole in his sinus cavity, but there is simply no medical/dental evidence to corroborate this conjecture. Plaintiff also states that his wife witnessed his

1  "infection," but he provides no evidence to support this statement, such as a declaration from his

2  wife. As Plaintiff points out, there was one occasion where Plaintiff was prescribed Amoxicillin,

3  on February 11, 2019; however, it appears on that date, Dr. Yup did note a lesion and swelling,

4  which warranted the prescription.

5      Plaintiff provides no evidence to refute that Hultenschmidt, as a dental assistant, does not

6  decide what treatment is performed, does not calendar appointments, and has no authority to

7  prescribe medications. (*See* Hultenschmidt Decl., ECF No. 57-6.)

8      In light of the evidence of the care Plaintiff received, the court cannot conclude that

9  Donnelly, Egerton or Dr. Minev were deliberately indifferent to Plaintiff's dental needs when

10  they responded to his grievance advising that he had been seen by the dental department many

11  times and had received appropriate care. (*See* ECF No. 57-2.)

12      In sum, Defendants have provided evidence that Plaintiff received ample, adequate dental

13  care and were not deliberately indifferent to his serious dental needs. In response, Plaintiff has

14  not submitted evidence to raise a genuine dispute of material fact that Defendants were

15  deliberately indifferent to his dental needs. Therefore, summary judgment should be granted in

16  Defendants' favor as to the Eighth Amendment claim.

17  **B. Retaliation**

18      **1. The Claim**

19      The court allowed Plaintiff to proceed with a retaliation claim only against Dr. Yup,

20  based on the allegation that he saw Dr. Yup for a follow up appointment on November 8, 2018,

21  and Dr. Yup asked him twice why he had filed grievances against her. Plaintiff alleges he did not

22  respond, and Dr. Yup then told Plaintiff there was no power to operate the chair so she would

23  have to reschedule Plaintiff, but he was not rescheduled until almost two months later. Plaintiff

1 | took this to mean that if he kept grieving, Dr. Yup would not treat his dental problems or would

2 | delay his treatment.

3 | **2. Exhaustion**

4 | Dr. Yup  argues that Plaintiff failed to exhaust his administrative remedies as to this

5 | claim.

6 | The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought

7 | with respect to prison conditions under section 1983 of this title, or any other Federal law, by a

8 | prisoner confined in any jail, prison, or other correctional facility until such administrative

9 | remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his

10 | administrative remedies irrespective of the forms of relief sought and offered through

11 | administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

12 | Exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm

13 | grievance, but rather, the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 89

14 | (2006). "Proper exhaustion" refers to "using all steps the agency holds out, and doing so

15 | *properly* (so that the agency addresses the issues on the merits)." *Id.* (emphasis in original)

16 | (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, "[s]ection 1997e(a)

17 | requires an inmate not only to pursue every available step of the prison grievance process but

18 | also to adhere to the 'critical procedural rules' of that process." *Reyes v. Smith*, 810 F.3d 654,

19 | 657 (9th Cir. 2016) (quoting *Woodford,* 548 U.S. at 90). "[I]t is the prison's requirements, and

20 | not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199,

21 | 218 (2007).

22 |

23 |

To have exhausted this claim, the grievance would have had to have been filed *after* the November 8, 2018 appointment. Therefore, the June 25, 2018 grievance Plaintiff filed about his dental care would not serve to have exhausted this claim. (ECF No. 57-2.)

Plaintiff filed another grievance on November 16, 2018. In that grievance, he asserted that on November 7, 2018, Donnelly, and Dr. Yup in reprisal for his second level grievance 20063068061 (the grievance initiated in June of 2018), made a disparaging comment about his weight. Specifically, he said that on November 7, 2018, Donnelly gave him his insulin shot and said, "when you get off the [Elavil] medication maybe you will lose some weight." Plaintiff stated he is sensitive and this remark was unwelcome. Then, on the following day, November 8, 2018, Dr. Yup demanded to know why Plaintiff filed a grievance against her. She then x-rayed Plaintiff's teeth and said he had a lot of bad teeth caused by the Elavil medication. He asserts that Dr. Yup then turned him away with Donnelly snickering, claiming there was no power to operate the chair or instruments and said Plaintiff would be rescheduled. He asked for Donnelly to stop making unprofessional remarks, and to cease reprisal for grievances, and to be treated in a courteous manner. (ECF No. 57-3 at 7-9.) Plaintiff proceeded with the first and second levels of this grievance. (*Id*. at 2-4, 10.)

This grievance could be construed as asserting that Dr. Yup was retaliating against him for filing grievances by rescheduling his appointment. Therefore, Defendants' motion should be denied insofar as they argue Plaintiff failed to exhaust administrative remedies with respect to the retaliation claim.

**3. Merits**

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791

F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of the following elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

Dr. Yup argues that Plaintiff cannot demonstrate she retaliated against him as no adverse action occurred because Plaintiff waited for dental treatment in the same manner and for the same length of time as other inmates. In addition, she contends that neither the malfunctioning equipment nor the inmate-to-provider ratio are her fault. Dr. Yup acknowledges that she warned Plaintiff against filing *unfounded* grievances and having outside third parties intervene regarding non-emergent conditions.

Plaintiff contends that Dr. Yup retaliated against him and punished him for having his wife call NDOC and for his filing grievances. He points out that Dr. Yup admits that she warned Plaintiff that his tactics of filing multiple grievances and kites to be seen ahead of other patients without justification would not be tolerated.

The adverse action here is Dr. Yup's rescheduling Plaintiff's appointment to a later date. There must be evidence that the adverse action was taken *because of* the protected conduct, i.e., the grievance filing. Plaintiff acknowledges that Dr. Yup told him his appointment had to be rescheduled because the equipment was not operable that day. Plaintiff speculates that it was really because of his grievance filing. The court finds, however, that there is no evidence to support this conjecture. While he was next seen roughly two months later, on January 7, 2019, that is consistent with the scheduling of his other visits, which were generally every month or

two. Moreover, the dental records demonstrate that Dr. Yup continued to provide Plaintiff with treatment, contrary to Plaintiff's allegations. Therefore, summary judgment should be granted in Dr. Yup's favor as to the retaliation claim.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Defendants' motion for summary judgment (ECF No. 57).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: January 12, 2022

_____
William G. Cobb
United States Magistrate Judge